STATE OF MAINE
PENOBSCOT, SS.

FILED & ENTERED SUPERIOR COURT
SUPERIOR COURT Docket No. CV-04-244

APR 1 3 2006

PENOBSCOT COUNTY

CHRISTOPHER THOMPSON, )
                   Plaintiff, )
                              )
                              )
        v.                    )        **DECISION AND JUDGMENT**
                              )
                              )
                              )
THOMPSON'S HARDWARE,          )
INC., and Raymond Thompson,   )
            Defendants.        )

This dispute concerns the ownership and operation of a retail hardware store in Enfield, Maine. The store is operated by Defendant Thompson's Hardware, Inc., a Maine corporation. Plaintiff Christopher Thompson (herein, "Chris") asserts that he is an actual or equitable part owner of the corporation based upon the actions of his father, Defendant Raymond Thompson (herein, "Ray"). Chris has commenced a multiple count Complaint alleging various theories of recovery.

The parties disagree upon virtually all of the salient facts concerning this dispute. After trial, which commenced on March 15, 2006, the court finds the following facts:

## FACTS

Ray and Chris are father and son respectively. Ray has undertaken a variety of occupational and entrepreneurial ventures in his lifetime including the establishment of the Thompson's Hardware store in Enfield, Maine, which he started in 1980.[1] The store had operated earlier under previous owners and was performing satisfactorily when a large retail store – Nation's Hardware – opened nearby and Ray's store experienced a notable decline. At various points, the store was on a week-to-week payment plan with Bangor Hydro-Electric for electricity service and the bank was threatening foreclosure.

At approximately the same time, Chris was working for the Town of Howland plowing snow. Although he received full employment benefits, he was not entirely happy with his circumstances there. He and Ray engaged in discussions about the prospect of his joining his father in the operation of the store. In 1987, he left his employment and came to work at Thompson's Hardware.

The record shows that Chris was a regular employee and contributor at Thompson's Hardware. He assisted in all aspects of the operation of the store including management decisions regarding products and expansion. He worked approximately five days per week. During his tenure, the store's fortunes continued to swing upward,

---

[1] Ray created a corporate entity – Thompson's Hardware, Inc. - of which he was the sole stockholder to actually own and operate the store.

although it is not clear whether the upswing was the result of his contributions, the closing of the Nation's Hardware store, or a combination of both.

During the years between 1987 and 2003, Ray frequently expressed an intent to transfer or bequeath the store to Chris in one fashion or another.

During the same period, and particularly toward the end of the period, friction and animosity arose between Chris and Ray. The record suggests that each had their own strongly held beliefs about how the store was to be operated and their relationship occasionally devolved into argument and bickering. On one or more occasions, Chris left the store for a period of days. Each of the men had a vocal confrontation with the other's wife over issues related to the operation of the store. Chris made disparaging comments regarding Ray and his operation of the store; he expressed frustration and exasperation regarding his (Chris') role in the store. Ray made comments indicating his dissatisfaction with Chris' lack of contribution and commitment to the store operation. Vulgar language was used in the exchanges and Chris was physically aggressive and intimidating on at least on occasion.

In 2001, Chris started an entry into the real estate sales industry and eventually received an associate broker's license in 2003. He operated a real estate brokerage out of the store. At first, he simply used the telephone occasionally and displayed his brochures, but by 2003, his business had grown to the point where he was anticipating taking over office space within the store property to operate his brokerage. Although Ray was initially supportive of the brokerage undertaking, by 2003, he was upset by the extent that it interfered with the operation of the store and Chris' investment of time.

At some point, Ray may have executed a Will which bequeathed the store operation to Chris (although later refinements may have included other family members). The initial issuance of the corporation's total authorized stock was made exclusively to Ray. Additional stock certificates were filled out purportedly to subdivide the total stock between Ray and Chris, although the corporate ledger book never reflects such transactions. Income tax returns and corporate tax returns were generated which offered inconsistent references to Chris as a shareholder or officer.

In approximately late September, 2003, an incident occurred which drove a deep division into the widening chasm in the relationship between Ray and Chris. Each individual apparently had commitments over the Halloween holiday and wanted the other to work. Ray told Chris, "You are working [the Halloween period] !" and told him not to come back if he did not. Chris did not work.

Upon his return, Chris found his brochure stand broken. Ray would not refer real estate calls to him. The parties' work schedules had them overlapping on Tuesdays and Wednesdays, but they spoke little. Things continued to degenerate until early March, 2004, when Ray told Chris he was fired. Chris left and has not returned. Chris commenced this action seeking conveyance an interest in the store and other damages including lost wages and compensatory damages.[2]

---

[2] Chris' real estate business had experienced significant gross revenues after that date.

# CONCLUSIONS

At virtually all points in time through late 2003, Ray wanted Chris to ultimately have all or part of the ownership of the store at some point in the future . Despite the contention between the parties, the court is satisfied that Ray truly <u>did</u> want Chris to have the store some day. The court is equally satisfied that Ray was extremely reluctant to surrender control of the store to Chris until he was fully satisfied with Chris' commitment to the store (and him).

Upon the evidence submitted at trial, the court cannot find that anything approaching a binding contract had been achieved by the parties. Although Ray expressed a unilateral intention, or hope, or conditional expectation, that Chris would someday own and operate the store, clearly there was no *quid pro quo* agreed upon between the parties for its transfer. Although Chris worked and contributed during his association with the store, he was compensated for such, and the parties never suggested that his compensated efforts would constitute consideration for a contract to convey the business.

Nor did Ray's unilateral expressions create an estoppel of any sort. His comments were little more than statements of what was on his mind at the time. The court has little hesitation to conclude that they were simply the hopeful wishes of a father to have a mutually satisfactory partnership with his son (albeit with the father setting and controlling the conditions). Chris never sought a written commitment to the future course of their relationship in the early years. In later years when he became concerned and asked for such a document, none was produced.

Without attempting to delve too deeply into Ray's thought processes, it appears that he continued to be committed to the ultimate transfer of the business to Chris even in the face of bitter arguments and conflicts. After a particularly ugly confrontation in December, 1998, he still met with his attorney (Thatcher Adams) shortly thereafter to discuss the mechanics of transferring ownership to Chris. The court perceives Ray's motivation in this action to provide a basis to go to Chris and say, in effect, "Look ! I still am committed to bringing you into the store operation as an owner, but you have to modify your behaviors and commit yourself to the store ! I am not giving up on you." In other words, Ray was still hoping that Chris' behaviors would change and that the prospect of ownership would bring him around.

In short, the court finds that Ray occasionally expressed a heartfelt, but vague, intention to convey partial ownership to Chris at some future date. The court also finds that Ray was never completely comfortable in doing so unless he was satisfied that Chris was committed to the store (and to him after the transaction was complete). As such, Ray never intended to commit any act which would irrevocably vest Chris with ownership – although he was prepared to walk right up to the line in hopes that Chris would change his attitude.

Did he inadvertently go over the line ?

The case narrows to the irreconcilable accounts of the parties regarding he stock certificates. The court finds that the mere filling out of blank stock certificates in the absence of a corporate resolution (and the return of the original issuance by Ray)[3] and the lack of transfer noted in the ledger book, does not otherwise constitute an issuance of stock to Chris. However, if Ray presented or otherwise delivered the executed certificates to Chris, the court is satisfied that the transaction occurred.

Chris says the shares were presented to him. Ray says they were not.

Each party testified credibly regarding the occasion – or lack thereof – when certificates were allegedly presented by Ray to Chris. The court is left to resolve the issue.

The court finds that Ray consulted with attorney Thatcher Adams regarding the stock question. Adams reports that Ray spoke of his "up and down" relationship with Chris and the fact that he still intended to make a transfer to him, but wanted to wait until he was "ready." Adams advised him that the stock certificates could be filled out but would be without legal import until they were actually delivered.

Based upon the court's belief that Ray was not comfortable in irrevocably transferring partial corporate ownership to Chris in 2003, and Ray knew and undertook that the delivery of executed stock certificates would constitute a valid and legal transfer, the court resolves the credibility question regarding whether the delivery of stock certificates took place in the store in favor of Ray (i.e. – it did not take place). The court further finds that Chris is not owed any additional wages. Accordingly, as Plaintiff has failed to sustain his burden of proof, Judgment must be rendered in favor of the Defendants on all counts of the Complaint. In similar fashion, Judgment is rendered in favor of the Plaintiff on the Counterclaim. The court declines to award costs.

So Ordered.

The Clerk may incorporate this Order upon the docket by reference.

Dated: April 13, 2006

Andrew M. Mead
JUSTICE, MAINE SUPERIOR COURT

---

[3] No new shares were authorized after the corporation was initially incorporated. Accordingly, in order to "subdivide" Ray's stocks, they would first have to be reacquired by the corporation and reissued in an aggregate amount which would not exceed the total amount initially authorized. The record suggests no such surrender or reacquisition. Although the corporation's annual reports list Chris occasionally as an officer or shareholder, the court is satisfied that these entries (generally prepared by Dianne McKechnie, a store employee) are the result of inadvertence and do not, ipso facto, constitute or reflect stock conveyances.

CHRISTOPHER THOMPSON VS THOMPSONS HARDWARE INC ET AL
UTN:AOCSsr  -2004-0126302                    CASE #:BANSC-CV-2004-00244
------------------------------------------------------------------------

CHRISTOPHER THOMPSON                                         PL
ATTY GILBERT, CHARLES III Tel# (207) 947-2223
ATTY ADDR:82 COLUMBIA ST PO BOX 2339 BANGOR ME 04402-2339

THOMPSONS HARDWARE INC                                      DEF
ATTY COUGHLIN, EUGENE  Tel# (207) 947-6915
ATTY ADDR:23 WATER STREET PO BOX 919 BANGOR ME 04402-0919

RAYMOND THOMPSON                                            DEF
ATTY COUGHLIN, EUGENE  Tel# (207) 947-6915
ATTY ADDR:23 WATER STREET PO BOX 919 BANGOR ME 04402-0919




M=More, Space = Exit:M

Select the EXIT KEY for page selection line.

.